# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| R. L. MLAZGAR ASSOCIATES, INC., | Case No. 22-CV-942 (NEB/DJF) |
| Plaintiff, | |
| v. | ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |
| FOCAL POINT, L.L.C., LEGRAND NORTH AMERICA, LLC, and LEGRAND HOLDING, INC., | |
| Defendants. | |

---

When functioning properly, a sales agent-manufacturer relationship in the lighting products industry delivers bright outcomes for both parties—downstream demand is curated for the manufacturer's products and the sales agent is commissioned on the increased sales. Unfortunately, that did not happen here. Instead, the relationship between sales agent R. L. Mlazgar Associates, Inc. ("Mlazgar") and lighting products manufacturer, Focal Point, L.L.C. ("Focal Point") short-circuited. As a result, Focal Point terminated Mlazgar as its sales agent in the territory of Eastern Wisconsin and Michigan's Upper Peninsula (the "Territory"). Consequently, Mlazgar filed suit against Focal Point and its corporate family[1] for claims arising under the contract, statute, and tort.

---

[1] Focal Point's corporate parent is Legrand Holding, Inc. ("Legrand Holding"). Legrand Holding operates certain shared service functions through Legrand North America, LLC ("Legrand North America").

The first of Mlazgar's claims is brought under the Minnesota Termination of Sales Representatives Act ("MTSRA"). The parties cross-move for summary judgment on that claim. Defendants also move for summary judgment on the rest of Mlazgar's outstanding claims, while Mlazgar moves for summary judgment on each of Defendants' counterclaims. (ECF Nos. 322, 329.) For the reasons illuminated below, Defendants' motion is denied as to Counts I and VI, and is otherwise granted as to the other remaining claims, while Mlazgar's motion is granted as to liability for Count I of its claims and as to each of Defendants' counterclaims to the extent that they are not moot.

## BACKGROUND[2]

### I. Specification Distribution in the Lighting Products Industry

Focal Point manufactures lighting and lighting-control products primarily for large-scale projects (e.g., schools, correctional facilities, and commercial offices). (ECF No. 325-1 (sealed) ¶¶ B, 4(a).) Focal Point relies on specification distribution for the distribution of its products.[3] Specification distribution requires manufacturers like Focal

---

[2] On cross-motions for summary judgment, the Court views the record in the light most favorable to the plaintiff when considering the defendant's motion and in the light most favorable to the defendant when considering the plaintiff's motion. *Fjelstad v. State Farm Ins.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012).

[3] The lighting products industry utilizes two primary distribution channels: specification distribution and stock distribution. (ECF No. 338-18 at 156:13–157:10.) This litigation pertains only to Mlazgar's involvement in the specification distribution of Focal Point products. (ECF No. 339 (sealed) at 12; *see* ECF No. 355 (sealed) at 3–4 (explaining Mlazgar's involvement in the specification distribution of Focal Point's products).)

Point to use sales agents like Mlazgar to solicit demand for their supply. (*See id*. ¶ 4(a).) One way sales agents add value is by promoting the manufacturer's products to "specifiers"—engineers and architects of large-scale construction and remodeling projects—to induce them to prepare project specifications compatible with the manufacturer's products. (ECF No. 325-2 (sealed) at 24:21–25; ECF No. 325-3 (sealed) at 40:15–41:2, 42:11–18; ECF No. 325-18 (sealed) at 54:8–24; ECF No. 332-46 (sealed) at 26:7–12; ECF No. 338-18 at 17:17–22.[4])

Once a project is "specified" for construction, two additional players enter the distribution chain: electrical contractors and electrical distributors. Electrical contractors—acting as agents on behalf of the project's general contractor—request compatible products for the specified project from electrical distributors. These distributors, in turn, request quotes from sales agents (like Mlazgar) for the manufacturer's products to match the contractors' requests. (ECF No. 325-5 (sealed) at 36:5–18; ECF No. 325-18 at 52:20–53:23; ECF No. 332-45 (sealed) at 195:18–196:10.) Finally, the distributors resell the lighting products to the contractors for ultimate installation into the project. (ECF No. 325-2 at 24:15–20; ECF No. 325-3 at 42:19–23; ECF No. 325-5 at 36:1–11; ECF No. 325-6 (sealed) at 27:20–22.)

---

[4] Page numbers reflect CM/ECF pagination, except for citations to deposition transcripts, which reflect the native pagination of the transcripts.

Under this distribution chain, Mlazgar adds value as a sales agent for Focal Point in two ways. First, as noted above, Mlazgar promotes Focal Point products to specifiers to induce them to design projects compatible with Focal Point products. Second, Mlazgar facilitates sales of specific orders for Focal Point products to electrical distributors.

## II.    Defendants' Corporate Structure

Focal Point is one of Legrand Holding's wholly-owned subsidiary manufacturers of lighting products.[5] (ECF No. 332-35 (sealed) at 26:6–12.) Legrand North America is not owned by Legrand Holding and has no ownership interest in Focal Point or in any of Legrand Holding's lighting products subsidiaries. (ECF No. 144 at 1; ECF No. 331-41 at 6.) Instead, Legrand North America handles shared service functions for Legrand Holding. (ECF No. 331-41 at 3.)

## III.    Factual Background

### A.    *Mlazgar Acquires Elan, Focal Point's Sales Agent in the Territory*

In October 2020, Mlazgar sought to expand its reach as a sales agent. It acquired Elan, Focal Point's sales agent for the Territory. (ECF No. 331-2; ECF No. 332-1 (sealed).) As part of the acquisition, Mlazgar inherited Elan's contracts—including Elan's sales representative agreement with Focal Point—and brought on various former Elan

---

[5] Legrand Holdings' other wholly-owned manufacturers of lighting and related products are Kenall Manufacturing Co. ("Kenall"), The Original Cast Lighting, Inc. ("OCL"), Finelite, Inc., Pinnacle Architectural Lighting, Inc. (ECF No. 332-35 at 25:8–13, 26:6–12.)

4

employees to join its team. (ECF No. 331-2; ECF No. 332-40 (sealed) at 33:7–20; ECF No. 332-46 at 82:9–83:2.)

### B.    *Mlazgar Employees Depart to Form Competing Sales Agency*

Soon after, one of Mlazgar's newly-acquired employees from Elan, Justin Hendrickson, began communicating with Jon Kirkhoff of JTH Lighting Alliance, Inc. ("JTH"). (ECF Nos. 343-19–343-33 (all sealed).) JTH competes with Mlazgar in the lighting products sales agency market; but at that time, JTH had no offices or sales agents in Wisconsin. (ECF No. 343-9 (sealed) at 48:23–49:12.)

While Hendrickson was still employed by Mlazgar, he began to solicit various manufacturers—including a Legrand Holding subsidiary different from Focal Point (OCL)—about changing their Wisconsin sales agent representation to JTH. (ECF No. 343-17 (sealed) at 51:3–6, 58:2–21; ECF No. 343-18 (sealed).) JTH's Kirkhoff corresponded, in turn, with Legrand Holding Vice President of Sales David Michals many times in the months after Mlazgar acquired Elan.[6] (ECF Nos. 343-34–343-39 (all sealed).) Kirkhoff's correspondence with Michals culminated on December 22, 2020, in an email thread about "The Plan." (ECF No. 343-16 (sealed).) In "The Plan" correspondence, Kirkhoff and Michals discussed JTH: (1) acquiring seven Mlazgar employees; (2) becoming the sales

---

[6] The parties dispute if Hendrickson, Kirkhoff, and Michals were ever all on a conference call together on December 17, 2020. (ECF No. 342 (sealed) at 15; ECF No. 359 at 3.)

agent for various other lighting manufacturers in the region; and (3) receiving a "market development" payment from Legrand Holding. (*Id.*)

The Plan materialized in January 2021. Seven former Elan employees who had been brought on by Mlazgar[7] departed Mlazgar and started a new entity, JTH Lighting Alliance Wisconsin, LLC ("JTH-Wisconsin"), directly competing with Mlazgar in the Territory. (ECF No. 343-13 (sealed); ECF No. 343-9 (sealed) at 48:23–49:23.) Several lighting manufacturers other than Focal Point (including other Legrand Holding subsidiaries) designated JTH-Wisconsin as their sales agent in the Territory. (ECF No. 332-12 (sealed) at 2; ECF No. 332-13 (sealed); ECF No. 332-36 (sealed) at 81:15–19.) Legrand Holding also advanced a market development payment of $250,000 through Legrand North America to JTH. (ECF No. 343-47 (sealed); ECF No. 343-48 (sealed).)

The next month, Mlazgar brought suit against JTH, JTH-Wisconsin, JTH Holdings, Inc., and the seven employees for misappropriation of trade secrets and related claims. *See R.L. Mlazgar Assocs., Inc. v. JTH Lighting All., Inc.*, No. 27-CV-21-1715, Dkt. 2 (Minn. Dist. Ct. Feb. 11, 2021). That suit settled in 2023. *Id.* at Dkt. 185.

C.    *Mlazgar and Focal Point Enter into Sales Representative Agreement*

For a while, despite the turnover within Mlazgar and the launch of JTH-Wisconsin, the newly-formed relationship between Mlazgar and Focal Point in the Territory held

---

[7] The employees are Hendrickson, Nick Pucci, Jamie Napolitano, Christopher Klein, Dave Mantey, Michael Simonson, and Dave Huber. (ECF No. 343-16 at 1.)

steady. On March 10, 2021, the parties formalized their continuing relationship by entering into a new sales representative agreement for Mlazgar to represent Focal Point exclusively in the Territory for a renewable one-year term. (ECF No. 325-1 ("Sales Representative Agreement").)

### D.    *Focal Point Attempts to Terminate Sales Representative Agreement*

But the stable business relationship did not last long; Mlazgar's sales figures for Focal Point declined, and on February 7, 2022, Focal Point told Mlazgar of its intent to terminate the Sales Representative Agreement. (ECF No. 332-6 (sealed); ECF No. 340-16 (sealed) at 105:2–9.) The next day, Focal Point emailed Mlazgar that it was providing thirty-days' notice of its intent to terminate the Sales Representative Agreement, because it was "entertaining a new course of direction going forward." (ECF No. 325-8 (sealed).) Not surprisingly, that new direction was to replace Mlazgar with JTH-Wisconsin. Focal Point treated the Sales Representative Agreement as terminated on March 12, 2022, thirty days after Mlazgar received the termination notice by mail. (ECF No. 332-8 (sealed) at 9; *see* ECF No. 333 (sealed) at 5.) Focal Point then named JTH-Wisconsin as its exclusive agent in the Territory. (ECF No. 332-10; *See* ECF No. 333 at 8 (representing that "[e]ffective March 13, 2022 . . . JTH-Wisconsin became Focal Point's exclusive agent in [the Territory]").)

In a letter sent to Focal Point, Mlazgar argued that the termination was void under the MTSRA, and so it continued to solicit orders for Focal Point products after the

termination date. (ECF No. 338-3 at 4.) Mlazgar also continued to list Focal Point's name and mark on its public line card on its website.[8] (ECF No. 338-8 at 5–7 (acknowledging that the Focal Point mark was on Mlazgar's website as of August 30, 2022).) And in late March 2022, Focal Point demanded that Mlazgar "cease and desist using and/or distributing [its] catalogs, product samples, pricing information, and other confidential information." (ECF No. 338-4 at 2.)

## IV.    This Litigation

A few weeks later, on April 14, 2022, Mlazgar sued Focal Point under the MTSRA. (ECF No. 1.) Since that original complaint, the parties have engaged in a dizzying array of amendments to the complaint, counterclaims, and amendments to those, and a teeter-totter of dispositive motion practice relating to the claims.[9] The parties also litigated

---

[8] A line card is published by a sales agent on its website to market the line of lighting manufacturers that it is allowed to represent as a sales agent. *See, e.g.*, Mlazgar Associates, Manufacturer Search, https://www.mlazgar.com/Manufacturers/All [https://perma.cc/223V-ATGH].

[9] Focal Point moved to dismiss the original complaint (ECF No. 7), which the Court denied. (ECF No. 21.) Focal Point then asserted nine counterclaims. (ECF No. 23.) After Focal Point filed its initial counterclaims, Mlazgar removed Focal Point's marks from its website. (ECF No. 340-4 (sealed) at 2; ECF No. 340-8 (sealed) at 161:10–163:5.) In an oral ruling on February 27, 2023, the Court dismissed two of Focal Point's counterclaims. (ECF No. 51.) In September 2023, Mlazgar then twice amended its complaint, adding Legrand North America as a defendant, and raising additional claims for misappropriation of trade secrets, breach of contract, and various common law torts. (ECF Nos. 83, 97.) Focal Point and Legrand North America moved to dismiss the second amended complaint. (ECF No. 113.) After the motion to dismiss was filed, Mlazgar filed a third amended complaint adding Legrand Holding as a defendant. (ECF No. 178.) United States Magistrate Judge Dulce J. Foster ordered that the third amended complaint be treated as

almost too many discovery disputes to count. (*See* ECF No. 304 at 1–4 (recounting the extensive history of discovery in this litigation), *aff'd*, ECF No. 336.) Discovery has now closed, and each party moves for summary judgment on Mlazgar's MTSRA claim. Both sides also move for summary judgment on each of the other party's remaining claims. (ECF Nos. 322, 329.) The parties' outstanding claims are as follows:

*Mlazgar's Claims:*

- Count I (Minnesota Termination of Sales Representatives Act)
- Count III (Minnesota Uniform Trade Secrets Act)
- Count IV (Defend Trade Secrets Act)
- Count VI (Breach of Contract)
- Count VII (Aiding and Abetting Breaches of Fiduciary Duties)
- Count VIII (Civil Conspiracy)
- Count IX (Tortious Interference with Contract)
- Count X (Tortious Interference with Prospective Economic Advantage)

*Defendants' Counterclaims:*

- Counterclaim Count I (Breach of Contract)
- Counterclaim Count II (Trademark Infringement)
- Counterclaim Count III (False Designation of Origin, False Description, Unfair Competition)
- Counterclaim Count IV (Illinois Deceptive Trade Practices Act)
- Counterclaim Count V (Illinois Consumer Fraud and Deceptive Business Practices Act)

---

the operative complaint. (ECF No. 179.) Then, in June 2024, the Court ruled on Defendants' motion to dismiss as applied to the operative complaint—dismissing Mlazgar's claims for fraud, conversion, and unjust enrichment (Counts II, V, and XI, respectively), and otherwise leaving Mlazgar's action intact. (ECF No. 221.) Focal Point then amended its counterclaims, adding Legrand North America and Legrand Holding as counterclaimants. (ECF No. 228.) Mlazgar moved to dismiss Defendants' counterclaim for tortious interference with prospective economic advantage. (ECF No. 229.) The Court granted Mlazgar's motion and dismissed that counterclaim (Count VII). (ECF No. 284.)

# ANALYSIS

## I.    Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute of fact is "genuine" if a factfinder could reasonably determine the issue in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On cross-motions for summary judgment, the Court views the record in the light most favorable to the plaintiff when considering the defendant's motion and in the light most favorable to the defendant when considering the plaintiff's motion. *Fjelstad*, 845 F. Supp. 2d at 984. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and citation omitted).

## II.    Count I: MTSRA Claim

Mlazgar claims that Focal Point[10] violated the MTSRA—Minnesota Statutes Section 325E.37—by terminating and non-renewing the Sales Representative Agreement without good cause and without providing sufficient statutory notice and an opportunity

---

[10] Mlazgar brings Count I against only Focal Point. (ECF No. 178 at 18.)

for cure.[11] (ECF No. 178 ¶¶ 79–87.) The crux of this dispute is (a) whether the MTSRA is

the applicable substantive law (rather than Illinois law), (b) whether Focal Point properly

terminated and non-renewed Mlazgar under the statute, and (c) if not, whether Mlazgar

is a "sales representative" protected by the MTSRA.

### A.    Choice of Law

The first question is an easy one. The Sales Representative Agreement includes a

governing law provision suggesting that Illinois law governs the contractual relationship

between Mlazgar and Focal Point. (ECF No. 325-1 ¶ 12(b).) But the MTSRA includes a

statutory anti-waiver provision:

> (a) No manufacturer, wholesaler, assembler, or importer shall circumvent
> compliance with this section by including in a sales representative
> agreement a term or provision, whether express or implied, that includes
> or purports to include:

> (1) an application or choice of law of any other state.

Minn. Stat. § 325E.37, subdiv. 7(a)(1). And the statute considers any such term or

provision "void and unenforceable." *Id.*, subdiv. 7(b).

Because Mlazgar is a Minnesota-domiciled corporation,[12] (ECF No. 178 ¶ 9), the

Illinois governing law provision in the Sales Representative Agreement is void and

---

[11] The MTSRA governs when and under what conditions a manufacturer may terminate
or non-renew a "sales representative agreement." Minn. Stat. § 325E.37, subdivs. 2, 3.

[12] The MTSRA "applies to a sales representative who, during some part of the period of
the sales representative agreement[] is a resident of Minnesota or maintains that person's
principal place of business in Minnesota." *See* Minn. Stat. § 325E.37, subdiv. 6(a)(1).

unenforceable (assuming, as analyzed below, that Mlazgar is a "sales representative'

under the statute).[13] *See, e.g., Hedding o/b/o Hedding Sales & Serv. v. Pneu Fast Co.*, No. 18–

CV–1233 (JRT/SER), 2019 WL 79006, at *4 (D. Minn. Jan. 2, 2019) ("Minnesota has a

clearly-defined policy of protecting its sales representatives from agreements purporting

to waive the protections of the MTSRA by any means. This policy precludes the Court

from honoring contractual choice-of-law provisions."); *Apex Tech. Sales, Inc. v. Leviton*

*Mfg., Inc.*, No. 17-CV-2019 (SRN/HB), 2017 WL 2731312, at *4 (D. Minn. June 26, 2017)

("[T]he MTSRA . . . contains an 'anti-waiver' provision, making such choice-of-law

provisions [in sales representative agreements] void and unenforceable.").

## B.    *Adequacy of Notice of Termination and Non-Renewal Under MTSRA*

Because the MTSRA applies, the next question is whether Focal Point's conduct in

attempting to terminate and non-renew the Sales Representative Agreement is

proscribed. "A manufacturer . . . may not terminate a sales representative agreement

unless [it] has good cause." Minn. Stat. § 325E.37, subdiv. 2. And so, a manufacturer must

provide the sales representative with "written notice setting forth the reason(s) for the

termination at least 90 days in advance of termination," and must also provide the sales

representative with an opportunity "to correct the reasons stated for termination in the

notice within 60 days of receipt of the notice." *Id.*, subdiv. 2(a)(1)–(2). In addition, absent

---

[13] The Court applies Minnesota's substantive law as codified by statute. *Brenner v. Nat'l Outdoor Leadership Sch.*, 20 F. Supp. 3d 709, 716 (D. Minn. 2014); *see also Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).

good cause, and an opportunity for cure, a manufacturer may not "fail to renew a sales representative agreement [for a term of years] unless the sales representative has been given written notice of the intention not to renew at least 90 days in advance of the expiration of the agreement." *Id.*, subdiv. 3.

Focal Point violated both provisions. It provided only thirty days' notice to Mlazgar of its intention to terminate the Sales Representative Agreement.[14] It also did not give Mlazgar a chance to cure, and did not delineate "good cause" for the termination.[15] Because of these obvious violations of the statute, Focal Point's liability hinges on whether Mlazgar falls within the definition of a "sales representative" under the MTSRA.

### C.    *Mlazgar as a "Sales Representative" Under the MTSRA*

Section 325E.37, subdivision 1(d) of the MTSRA provides a general definition of a "sales representative," and carves out four specific exclusions from that definition:

> d) "Sales representative" means a person who contracts with a principal to solicit wholesale orders and who is compensated, in whole or in part, by commission.

---

[14] Focal Point's termination letter also operated with the effect of non-renewing the Sales Representative Agreement between the parties. (*See* ECF No. 325-1 ¶ 2 (noting that the term of the Agreement was for one year beginning on March 10, 2021, and could be renewed for successive one-year terms).)

[15] The only reason for the termination provided in the notice was that it was "based on entertaining a new course of direction going forward." (ECF No. 325-8.) This reason is not "good cause" under the MTSRA. *See* Minn. Stat. § 325E.37, subdiv. 1(b)(1)–(6) (listing statutory good cause justifications); *see also Apex Tech. Sales*, 2017 WL 2731312, at *6 (finding the sales representative likely to succeed on its MTSRA claim when the manufacturer "did not identify any reason for termination in its notice").

Sales representative does not include a person who:

(1) is an employee of the principal;
(2) places orders or purchases for the person's own account for resale;
(3) holds the goods on a consignment basis for the principal's account for resale; or
(4) distributes, sells, or offers the goods, other than samples, to end users, at retail.

Minn. Stat. § 325E.37, subdiv. 1(d); *see Robbins & Meyers, Inc. v. Winger Assocs., Inc.*, 874 F. Supp. 252, 255 (D. Minn. 1993) (explaining statutory scheme). Only the general definition and the fourth specific exclusion are at issue here.

1.    *General Definition: Does Mlazgar Solicit Wholesale Orders?*

Focal Point first claims that Mlazgar does not fit under the general definition, because it did not solicit "wholesale orders" on Focal Point's behalf. (ECF No. 339 at 16–17.) The statute defines "wholesale orders" as "the solicitation of orders for goods by persons in the distribution chain for ultimate sale at retail . . . ." Minn. Stat. § 325E.37, subdiv. 1(f). Focal Point argues that the "wholesale orders" definition excludes Mlazgar, because Mlazgar "facilitated the sale of Focal Point products directly to the end user, and neither the end user nor the electrical distributor resold the product." (ECF No. 339 at 17 (contrasting with cases where a "sales agent sold the defendant manufacturer's products to a big-box retailer (such as Menards or Target) for *resale* to the ultimate consumer" (emphasis in original))[16].)

_____

[16] Focal Point cites to a series of cases for this proposition. (*See* ECF No. 339 at 16–17 (collecting cases).) But with one exception, none of these cases analyzed whether the

Focal Point's argument ignores the unique nature of the specification distribution chain in the lighting products industry. Although sales agents like Mlazgar work on behalf of the manufacturers to market to specifiers to induce them to prepare project specifications compatible with the manufacturer's line of products, Mlazgar's role in the actual transactions in the distribution chain is between Focal Point and the *distributors*. Electrical distributors request quotes through Mlazgar for Focal Point's products to match the specified requests that distributors receive from the downstream electrical contractors. (ECF No. 325-5 at 36:5–18.) In other words, Mlazgar solicits the sale of goods to the middleman (electrical distributor), who then ultimately sells the goods to the electrical contractor for installation into the project.[17]

---

plaintiff solicited "wholesale orders" within the definition of the MTSRA. The only case that analyzed the application of the definition in Section 325E.37, Subdivision 1(f) was *HEK, LLC v. Akstrom Imports, Inc.*, No. 20-CV-1881 (NEB/LIB), 2021 WL 679585 (D. Minn. Feb. 22, 2021). But the Court's ruling in *Akstrom Imports* was not so limited—the Court merely held in that case that the sales representative who solicited orders from the defendant to Wal-Mart and Sam's Club fell within the statutory definition. *Id*. at *6. The Court never held that the MTSRA *only* applied to sales representatives who solicited orders to big-box retailers who then resold goods at physical retail shops to consumers.

[17] Focal Point responds that "[t]he electrical distributor's only involvement was to simplify the end user's process of obtaining the entire electrical bill of materials for a specific project and to temporarily carry the cost of the Focal Point products." (ECF No. 339 at 17.) Even so, the statute does not make a distinction on its face between sales to distributors who procure bulk quantities of generalized products for resale at big box retailers and distributors who act as middlemen in the distribution of specified products to identifiable end users. Without express legislative intent to differentiate on that basis, the Court declines to do so. *See Cnty. of Dakota v. Cameron*, 839 N.W.2d 700, 709 (Minn. 2013) ("[W]e do not add words or phrases to an unambiguous statute.").

2.    *Specific Exclusion: Does Mlazgar Distribute, Sell, or Offer Goods to End Users, at Retail?*

The next question is whether the fourth specific exclusion in the MTSRA nevertheless precludes Mlazgar from being a "sales representative" protected under the statute. A person who "distributes, sells, or offers the goods, other than samples, to end users,[18] at retail" is not a "sales representative." Minn. Stat. § 325E.37, subdiv. 1(d)(4). Focal Point argues that Mlazgar's "responsibility under the [Sales Representative] Agreement was . . . to offer Focal Point's products to ultimate consumers (the project owners/developers) for their own use (installation at the project location)."[19] (ECF No. 339 at 19.) Thus, Focal Point reasons that Mlazgar only ever offered its lighting products directly "to end users, at retail." (*Id*.)

As discussed above, Mlazgar adds value to Focal Point in two ways. First, it promotes Focal Point products to specifiers. By doing so, it aims to cultivate downstream demand so that specifiers will prepare project specifications compatible with Focal Point

---

[18] The Court considers the "end users" here to be the electrical contractors who act as the project owner's agents in purchasing lighting products for ultimate installation into the construction or remodeling project.

[19] Paragraph 4(a) of the Sales Representative Agreement provided that Mlazgar would:
Use its best effort, skills and knowledge to represent and promote the sale of Products, *soliciting business from a specification level and end-user market*, such as correctional facilities, education (schools and colleges), field environment, multi-housing, transportation, commercial office, manufacturing, warehouse and distribution and others as appropriate.
(ECF No. 325-1 ¶ 4(a) (emphasis added).)

products. Second, it works with electrical distributors to solicit specific orders of Focal Point products. For both roles, the Court must consider whether Mlazgar "distributes, sells, or offers" goods to an "end user, at retail."

*Specifiers.* Mlazgar's role vis-à-vis specifiers does not qualify it for the exclusion. First, the record does not establish that specifiers are "end users." To be sure, specifiers are vital to identifying which lighting products electrical contractors request for their projects from electrical distributors. But specifiers are providing architectural and engineering services—they are not themselves making retail purchases of the lighting products. Second, in its role with specifiers, Mlazgar does not distribute, sell, or offer goods. Instead, Mlazgar merely *promotes and markets* Focal Point products to specifiers to try to induce them to prepare specifications compatible with Focal Point's product line. Marketing and promoting Focal Point's products is not the same as "distribut[ing], sell[ing], or offer[ing]" them "at retail." *See* Minn. Stat. § 325E.37, subdiv. 1(d)(4).

*Electrical distributors.* Mlazgar's role vis-à-vis electrical contractors also does not qualify it for the specific exclusion. First, Mlazgar's role centers on facilitating orders between Focal Point and the electrical distributors. The electrical distributors—and not the electrical contractors—pay Focal Point for the specified products (ECF No. 325-2 at 24:15–20), and Mlazgar receives commissions on these manufacturer-distributor sales. (*Id*. at 25:16–26:2.) The electrical distributors then resell the Focal Point products to the electrical contractors. (ECF No. 325-3 at 42:19–23; ECF No. 325-5 at 36:1–37:14; ECF

No. 325-6 at 27:1–25.) In fact, when Focal Point sells its products to electrical distributors, it does not charge them with any sales or use tax, because the distributors purchase Focal Point's products not for use, but for resale to the electrical contractors. (ECF No. 325-5 at 57:5–13.) Thus, the Court concludes that: (1) Mlazgar's role is to facilitate the sale of lighting products from Focal Point to the distributors (as shown by how Mlazgar earns commissions), and (2) the transactions between Focal Point and distributors are for resale, and not "at retail" (as shown by the lack of sales tax).

This analysis is consistent with the reasoning in *Robbins & Myers, Inc.*, 874 F. Supp. 252. In that case, the plaintiff was the successor-in-interest to Prochem Mixing Equipment, Ltd., which manufactured agitators and mixers for processing industries. *Id.* at 253. Prochem entered into an exclusive representation contract with Winger Associates "to sell Prochem mixers, accessories, and parts in the 'Upper Midwest' region . . . in return for a commission on all sales of Prochem products in its region." *Id*. Winger received commissions on sales that it made directly to "'end users' of Prochem products," who "utilized the Prochem products in their own manufacturing operations." *Id*. After Robbins & Myers acquired Prochem's assets, it notified Winger that it was discontinuing the contract upon thirty days' notice; and Winger filed an arbitration demand for various claims, including claims under the MTSRA. *Id*. at 253–54. Robbins & Myers brought suit for declaratory judgment that the dispute was not subject to arbitration because Winger was not a sales representative under the MTSRA. *Id*. at 254. The court agreed with

18

Robbins & Myers, reasoning that because "Winger sold and offered Prochem products 'to end users, not for resale,'[20] . . . the fourth exclusion under subdivision 1(d) of the [MTSRA]" applied. *Id*. at 255.

But the facts in *Robbins & Myers* are distinguishable here. In that case, the "end user" buyers of the Prochem products "*utilized* the Prochem products *in their own* manufacturing operations." *Id*. at 253 (emphasis added). That opinion recognized that sales "involv[ing] customers that *would have resold* the Prochem product *in some manner*" were not sales directly to end users. *Id*. (emphasis added). Here, it is electrical contractors who are the end users that "utilize[] the [Focal Point] products in their own [construction and remodeling] operations," while it is electrical distributors who "res[ell] the [Focal Point] product[s] in some manner" to electrical contractors. Because Mlazgar facilitated the sales of the Focal Point products to electrical distributors for further downstream

---

[20] The Court notes that when *Robbins & Myers* was issued, the fourth exception in Minnesota Statute Section 325E.37, subdivision 1(d)(4) read as not including a person who "distributes, sells, or offers the goods, other than samples, to end users, *not for resale*." 874 F. Supp. at 255 (citing the statutory language, emphasis added). The statutory language was amended in 2017, and now reads as not including a person who "distributes, sells, or offers the goods, other than samples, to end users, *at retail*." H.F. 1294, 90th Leg. at 2.14–2.15 (Minn. 2017) (emphasis added). The parties did not brief the significance of this amendment. But the Court considers the language to be a distinction without a difference. Merriam-Webster defines "retail" as "the sale of commodities or goods in small quantities *to ultimate consumers*." *Retail (noun)*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/retail [https://perma.cc/YX4C-5D2K] (emphasis added). A sale to an "ultimate consumer" is necessarily "not for resale," and so the amended language does not alter the analysis.

resale to the electrical contractors, it falls outside the exclusion for representatives that solicit sales "to end users, at retail." *Cf.* Minn. Stat. § 325E.37, subdiv. 1(d)(4).

Under these facts, Mlazgar is a sales representative pursuant to the MTSRA. Because Focal Point terminated Mlazgar as a sales representative without good cause and without complying with the notice and cure provisions, it is liable under the MTSRA. The Court denies Focal Point's motion for summary judgment on Count I and grants Mlazgar's motion for summary judgment as to Focal Point's liability on that count.

### D.    *Damages*

But the Court denies Mlazgar's motion to the extent that it seeks summary judgment disposition on the amount of damages. As Mlazgar even admits, the amount of damages is a disputed fact question. (ECF No. 324 (sealed) at 14; ECF No. 342 at 6.) Thus, the amount of damages is for the jury to decide at trial. That said, because the Court considers Focal Point liable for both unlawful termination and nonrenewal of the Sales Representative Agreement, Mlazgar may present evidence to the trier of fact of damages under both theories.[21] (*See* ECF No. 324 at 11–14; ECF No. 355 at 11–12.)

---

[21] The Court does not now decide whether Mlazgar "is entitled to present evidence at trial of lost profits on lost sales beyond the one-year renewal period." (ECF No. 324 at 14.) The Court also declines to address Focal Point's contention that Mlazgar's claimed damages are supported only by inadmissible hearsay. (*See* ECF No. 339 at 5 n.2.) Such evidentiary disputes may be brought ahead of trial.

### III.    Defendants' Motion for Summary Judgment on Remaining Counts

Defendants move for summary judgment on each of the outstanding counts remaining in Mlazgar's complaint, including Counts III and IV for trade secrets misappropriation under the Minnesota Uniform Trade Secrets Act ("MUTSA") and the federal Defend Trade Secrets Act ("DTSA"); Count VI for breach of the Sales Representative Agreement; Count VII for aiding and abetting breaches of fiduciary duties; Count VIII for civil conspiracy; and Counts IX and X for tortious interference with a contract and with a prospective economic advantage.

### A.    Choice of Law

Five of the remaining claims are state common law claims—with a choice-of-law issue the Court must resolve.[22] Defendants contend Illinois law applies. Relying on a provision in the Sales Representative Agreement, Defendants argue that Illinois substantive law applies not only to Mlazgar's contract-based claims, but also to Mlazgar's claims sounding in tort, which they consider to arise out of the contract. (ECF No. 333 at 13.) Defendants assert that the tort claims "rest solely on whether Defendants misappropriated [Mlazgar's] trade secrets," which would require the Court to interpret

---

[22] Count IV is brought under the DTSA, a federal statute. Count III is brought under the MUTSA, a state statute. Defendants do not argue that MUTSA may not be constitutionally applied to its conduct. And the Court does not see an outcome-determinative difference between the MUTSA and the Illinois Uniform Trade Secrets Act. *Compare* Minn. Stat. §§ 325C.01–325C.08 *with* 765 Ill. Comp. Stat. 1065/1–9. Thus, the Court applies the MUTSA here.

the confidentiality provisions of the Sales Representative Agreement. (*Id*. (citing *Superior Edge, Inc. v. Monsanto Co.*, 964 F. Supp. 2d 1017, 1031–32 (D. Minn. 2013).) By contrast, Mlazgar argues that Minnesota substantive law applies to all the remaining common law claims, because the "Defendants have not shown, let alone argued, that a conflict exists between Minnesota law and Illinois law warranting a choice of law analysis." (ECF No. 342 at 8; *see Healey v. I-Flow, LLC*, 853 F. Supp. 2d 868, 875 (D. Minn. 2012) ("If the Court concludes that there is no actual conflict between the laws of the two states, then the inquiry proceeds no further, and the Court applies Minnesota law.").

In determining the appropriate substantive law to apply, the Court follows Minnesota's approach to resolving choice of law issues. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Generally, courts first determine whether an outcome-determinative conflict exists. *Jepson v. Gen. Cas. Co. of Wisc.*, 513 N.W.2d 467, 469 (Minn. 1994). If a conflict exists, courts then determine whether the law of both states can be constitutionally applied. *Id*. at 469–70. If it is constitutionally permissible to apply Minnesota substantive law, courts consider five factors to evaluate whether to apply Minnesota law. *Id*. at 470 (citing *Milkovich v. Saari*, 203 N.W.2d 408, 412 (Minn. 1973)). But when the parties to a dispute have entered into a valid contract with an enforceable governing law provision, Minnesota courts generally give effect to the contractual choice of law before even considering whether an outcome-determinative conflict exists. *Superior Edge, Inc.*, 964 F. Supp. 2d at 1031; *see also Milliken & Co. v. Eagle Packaging Co.*,

295 N.W.2d 377, 380 n.1 (Minn. 1980) ("This court is 'committed to the rule' that parties may agree that the law of another state shall govern their agreement and will interpret and apply the law of another state where such an agreement is made." (citation omitted)).

To the extent that the Sales Representative Agreement does not conflict with the MTSRA, the Court considers the Illinois governing law provision in the contract to have full force and effect. Thus, the Court applies Illinois substantive law to Mlazgar's breach of contract claim to the extent that that claim is not based on a breach of the MTSRA.[23]

As for Mlazgar's common law tort claims, the Court disagrees with Defendants' assertion that they "rest solely on whether Defendants misappropriated [Mlazgar's] trade secrets." (ECF No. 333 at 13.) While theft of trade secrets is one theory undergirding Mlazgar's common law tort claims, Mlazgar brings its claims under alternative theories as well. So the Court does not consider the interpretation of the Sales Representative Agreement to be necessary to resolving the tort claims, and does not apply the contractual governing law provision to the tort claims. *Cf. Superior Edge, Inc.*, 964 F. Supp. 2d at 1032.

Proceeding with Minnesota's choice-of-law framework, the Court determines that no outcome-determinative conflict exists between Minnesota and Illinois substantive

---

[23] Mlazgar alleges that Focal Point breached the Sales Representative Agreement by violating its confidentiality obligations and by breaching its obligations under the MTSRA. (ECF No. 178 ¶ 133; *see also* ECF No. 342 at 6–7 (considering the breach of contract claim to turn on a violation of the MTSRA and breach of the confidentiality provision of the Sales Representative Agreement).)

law[24] on Mlazgar's common law tort claims for aiding and abetting a breach of fiduciary duty and civil conspiracy.[25] Because there is no outcome-determinative conflict on these common law torts, the Court applies Minnesota law to these claims.[26] *Healey*, 853 F. Supp. 2d at 875.

As for the claims for tortious interference, at least one court has found an outcome-determinative difference between Minnesota and Illinois law. *See H Enters. Int'l, Inc. v. Gen. Elec. Cap. Corp.*, 833 F. Supp. 1405, 1414 (D. Minn. 1993) (considering that Illinois law requires another element of "some action by the defendant directed toward a third party which results in such interference"). But the Court need not resolve whether an outcome

---

[24] Neither party asserts that either Wisconsin or Michigan substantive law apply to the dispute, despite the Territory covering those states. Because the Court considers that either Illinois or Minnesota law may be constitutionally applied to the dispute, *see Allstate Ins. v. Hague*, 449 U.S. 302, 320 (1981), the Court does not address whether its choice of law analysis would change based on a comparison to Wisconsin or Michigan law.

[25] Under Minnesota law and Illinois law, courts generally apply similar elements to claims of aiding and abetting a breach of fiduciary duty and civil conspiracy. To the extent there are differences between the elements of the various torts, the Court does not consider any of the differences to be outcome-determinative here. *See Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999) (listing Minnesota law elements of aiding and abetting a breach of fiduciary duty); *Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 767 (Ill. App. Ct. 2003) (listing Illinois law elements of aiding and abetting a breach of fiduciary duty); *Lipka v. Minn. Sch. Emps. Ass'n, Loc. 1980*, 537 N.W.2d 624, 632 (Minn. Ct. App. 1995) (listing Minnesota law elements of conspiracy); *Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. 2004) (listing Illinois law elements of conspiracy).

[26] Even if the differences between substantive Illinois law and substantive Minnesota law were outcome-determinative, the Court determines that the balance of the *Jepson* factors supports applying Minnesota law to these claims.

determinative conflict still exists between Minnesota and Illinois law,[27] because the Court considers Minnesota law applicable to the tortious interference claims at the next step of Minnesota's choice-of-law framework. *See id*. at 1415–17 (applying Minnesota law despite finding an outcome-determinative conflict with Illinois law). In particular, the Court determines that the first three choice-influencing factors are all neutral—(1) predictability of results, (2) maintenance of interstate order, and (3) simplification of the judicial task— while the advancement of the forum's governmental-interest factor favors applying Minnesota law to govern an alleged interference with the business relations of a Minnesota company.[28] *See Jepson*, 513 N.W.2d at 470. Thus, Minnesota law governs each of Mlazgar's common law tort claims, including those for tortious interference (analyzed *infra*, Sections III(D)–(F)).

### B.    *Trade Secrets Claims (Counts III and IV)*

Turning to Mlazgar's statutory tort claims, Mlazgar brings suit under the MUTSA and the DTSA, alleging that Defendants misappropriated its confidential, protected trade

---

[27] It is unclear to the Court that Illinois tortious interference law does, in fact, conflict with Minnesota law. *Compare Grako v. Bill Walsh Chevrolet-Cadillac, Inc.*, 229 N.E.3d 869, 875 (Ill. App. Ct. 2023) (listing Illinois law elements of tortious interference with prospective economic advantage) *with Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014) (listing Minnesota law elements of tortious interference with prospective economic advantage).

[28] The better law factor "is not considered unless the other factors do not resolve the choice-of-law issue." *Johannessohn v. Polaris Indus., Inc.*, 450 F. Supp. 3d 931, 966 (D. Minn. 2020) (citing *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 455–56 (Minn. Ct. App. 2001)).

secrets. (ECF No. 178 ¶¶ 109, 121.) But each claim fails because Mlazgar has sued the wrong defendants—no evidence suggests that Focal Point, Legrand Holding, or Legrand North America ever misappropriated Mlazgar's trade secrets.[29]

Federal and state trade secrets claims are "analyzed together," given that "the two statutes share functionally equivalent definitions of their key terms." *Prairie Field Servs., LLC v. Welsh*, 497 F. Supp. 3d 381, 395 (D. Minn. 2020) (citation and quotation marks omitted). The statutes require plaintiffs to prove both that a trade secret exists and that it was misappropriated by the defendant. *MPAY, Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1016–17 (8th Cir. 2020).

Mlazgar has identified its trade secrets as the "database of information that [it] acquired from Elan" and the categories of information contained in the database, including an account services notebook, pricing information, quote and order histories, applications and engineering project information, contact information, contracts, and sales and project summaries. (ECF No. 343-2 (sealed) at 5; *see also* ECF No. 343-51 (sealed) (listing by Bates number, each document claimed to fall within the database of information).) But of all the information claimed by Mlazgar to be trade secret material,

---

[29] Whether JTH or the seven employees who left Mlazgar for JTH-Wisconsin misappropriated Mlazgar's trade secrets does not resolve whether Defendants did so.

the factual record establishes that only three documents may have ever been possessed

or viewed by Defendants (or their subsidiaries):[30]

> (1) a contact list containing customer names, points of contact, and email addresses, which was emailed by Hendrickson in April 2022 from his JTH account to Focal Point (ECF No. 332-19 (sealed));

> (2) a photometric report[31] for a parking garage with an Elan logo on each page that was in the possession of Legrand Holding's wholly-owned subsidiary Kenall, and was exchanged with JTH (ECF No. 332-20 (sealed));

> (3) the screenshot sent in December 2020 by Hendrickson to JTH Lighting CEO Jon Kirkhoff of a virtual sales meeting showing Mlazgar's sales figures for Legrand Holding's subsidiary OCL (ECF No. 332-21 at 15 (sealed)).

(*See* ECF No. 332-51 (sealed) at 268:3–9 (conceding that Mlazgar was unaware of any more

of its database information that Defendants had received or acquired).)

1.    *Existence of a Trade Secret*

None of the three materials possessed or viewed by Defendants (or their

subsidiaries), standing alone or aggregated together, constitutes trade secret material. For

information to qualify as a trade secret, it must: "(1) [be] not generally known or readily

ascertainable, (2) ha[ve] value as a result of its secrecy, and (3) [be] the subject of

---

[30] Mlazgar emphasizes that "it is undisputed that, while employed by Mlazgar, the Seven Employees downloaded Mlazgar's entire database that it had acquired from Elan, including the categories of information contained therein, for use at [JTH-Wisconsin]." (ECF No. 342 at 31.) But the seven employees, JTH, and JTH-Wisconsin are not the defendants here. The focus of the Court's inquiry is on the alleged trade secret material in the possession of Defendants.

[31] A photometric report is a design plan that reflects the lighting performance of fixtures selected for given dimensions of a project space. (ECF No. 332-43 (sealed) at 27:1–28:4.)

reasonable efforts under the circumstances to protect its secrecy." *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018) (citing *Wyeth v. Nat. Biologics, Inc.*, 395 F.3d 897, 899 (8th Cir. 2005)). An aggregation of information can constitute trade secret material even where each document individually is not a trade secret if the documents are used or compiled in a "novel or unique combination." *Strategic Directions Grp., Inc. v. Bristol-Myers Squibb Co.*, 293 F.3d 1062, 1065 (8th Cir. 2002) (citing *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 899 (Minn. 1983)).

First, the contact list is composed of readily-available information about the company names, contact persons, and email addresses of various electrical distributors and specifiers. (ECF No. 332-19.) Such customer information, by itself, is not a trade secret. *See Lasermaster Corp. v. Sentinel Imaging*, 931 F. Supp. 628, 637 (D. Minn. 1996) ("[I]nformation as to customers, including knowledge of contact persons . . . is readily ascertainable by proper means over the course of time without efforts beyond those ordinarily exerted by sales[persons]." (citation and quotation marks omitted)); *see also Harley Auto. Grp., Inc. v. AP Supply, Inc.*, No. 12-CV-1110 (DWF/LIB), 2013 WL 6801221, at *8 (D. Minn. 2013) (considering a customer list of names, addresses, account numbers, and phone numbers to not be a trade secret); *cf. also Fox Sports Net N., L.L.C. v. Minn. Twins P'ship*, 319 F.3d 329, 336 (8th Cir. 2003) ("[K]nowledge of industry contact people does not rise to the level of a trade secret because this type of unprotected information is readily ascertainable within a trade.").

28

Second, the photometric report comes from publicly available photometric specifications. (ECF No. 332-43 at 246:24–247:12.) And there are no facts before the Court suggesting that the calculations that Mlazgar uses to create photometric reports from such photometric specifications are not generally known or readily ascertainable, or that the calculations Mlazgar uses have value because of their secrecy.

Third, the sales figures in the screenshot from the meeting between Mlazgar and OCL would be readily ascertainable to Legrand Holding, because OCL is Legrand Holding's wholly-owned subsidiary. (ECF No. 332-35 at 26:6–12.) And even if this screenshot could be trade secret material, Mlazgar has not taken "reasonable efforts under the circumstances to protect its secrecy;" to the contrary, it disclosed the screenshot in a publicly-filed attorney affidavit in Mlazgar's state-court lawsuit against JTH. *See R.L. Mlazgar Assocs., Inc. v. JTH Lighting All., Inc.*, No. 27-CV-21-1715, Dkt. 104 at 28–34 (Minn. Dist. Ct. Mar. 15, 2022).

Moreover, even if the entire database of information could theoretically constitute trade secret material, there is nothing "novel or unique" about the combination of the three materials that were found in the possession of Defendants or their subsidiaries. *See Strategic Directions Grp.*, 293 F.3d at 1065. To the extent that value could derive from any

of these three documents, it would come from the information contained in each of the three items individually, and not because of their aggregation.[32]

### 2.    *Misappropriation*

Even if these three documents constitute trade secret material, there is no evidence in the record to establish that they were misappropriated by Defendants. Misappropriation requires the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5)(A); *MPAY Inc.*, 970 F.3d at 1017. For all three documents, the record is clear that Defendants either had no reason to know the documents were acquired by improper means or Defendants never acquired the documents.

As to the contact list, it does not provide any facial indication that it was Mlazgar's confidential material.[33] (ECF No. 332-19 at 5–16.) Even though the contact list was emailed to Focal Point by Hendrickson, the material was provided to Focal Point in April 2022 in

---

[32] Mlazgar's theory of their trade secrets claims is premised on the "unique combination" of information in its database and the purported "synergistic effect" of that aggregation of data. (ECF No. 342 at 27.)

[33] Defendants dispute that the contact list ever was Mlazgar's material to begin with. But accepting the facts in the light most favorable to Mlazgar, Elan's founder Steve Kohl testified that the information came from Elan, which the Court treats as true for purposes of this motion. (ECF No. 325-16 (sealed) at 148:3–19.)

response to an innocent inquiry about "obtain[ing] a[n] email list of *your* specifiers."[34] (ECF No. 332-19 at 3 (emphasis added).) Under these circumstances, in which Hendrickson had been employed by JTH-Wisconsin for well over a year, Focal Point would have little reason to believe that this list was not created by Hendrickson while he was employed by JTH-Wisconsin.

As to the photometric report, there are no facts in the record to suggest that Focal Point or Legrand Holding ever acquired the photometric report from Kenall (even though Kenall is Legrand Holding's wholly-owned subsidiary). Rather, the record suggests that the document was only exchanged between JTH and Kenall (which are each non-parties here). (ECF No. 332-20.)

And as to the screenshot, the record only reflects that Kirkhoff discussed with Hendrickson that he should "reach out to [Focal Point employee] Jimalee [Beno]," and later, Hendrickson sent Kirkhoff the screenshot. (ECF No. 332-21 at 12, 14–16.) But Beno testified in her deposition that she was unaware of the screenshot until after the litigation began. (ECF No. 332-41 (sealed) at 73:11–74:6.) And Mlazgar presents no evidence to dispute this information. (*See* ECF No. 332-51 at 264:15–18.) Thus, there is no basis in the record to conclude that Focal Point or Legrand ever acquired this screenshot.

---

[34] Focal Point knew that Hendrickson was the subject of a misappropriation lawsuit brought by Mlazgar at the time it requested a contact list from Hendrickson. (ECF No. 343-58 (sealed).)

Because Mlazgar failed to establish that Defendants ever misappropriated its trade secrets, Defendants are entitled to summary judgment on the DTSA and MUTSA claims.

### C.    Breach of Contract Claim (Count VI)

Mlazgar alleges that Focal Point[35] breached the Sales Representative Agreement in two ways: (1) by violating the confidentiality provision in the contract and (2) by violating the MTSRA. (ECF No. 178 ¶ 133.) To the extent that the claim is based on a violation of the MTSRA, it is subsumed by Mlazgar's claim under the MTSRA in Count I. Thus, the Court focuses only on Mlazgar's claim that Focal Point breached the Sales Representative Agreement by violating its confidentiality provision.

To establish an action for breach of contract under Illinois law, Mlazgar must show "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resultant injury to the plaintiff." *Mack Indus., Ltd. v. Vill. of Dolton*, 30 N.E.3d 518, 528 (Ill. App. Ct. 2015). Mlazgar's claim hinges on the third and fourth elements.

The Sales Representative Agreement's confidentiality provision reads:

<u>Confidentiality</u>. "<u>Confidential Information</u>" means any information disclosed by a party to another party to this Agreement, either directly or indirectly, in writing, orally or by inspection of tangible objects . . . that is designated as "Confidential", "Proprietary" or some similar designation, or is of such a nature or has been disclosed in such a manner that it should be obvious to the receiving party that such is claimed as confidential. Confidential information includes, without limitation, a disclosing party's

---

[35] Mlazgar brings its breach of contract claim against only Focal Point. (ECF No. 178 ¶¶ 130–35.)

trade secrets, know-how, intellectual property, customer and prospect lists, proprietary information, business plans, funding sources, financial data, and the status and terms of any discussions between the parties regarding this Agreement. . . . Each party agrees not to use any Confidential Information of the other party for any purpose except for purposes of performing this Agreement. Each party agrees not to disclose any Confidential Information of the other party to third parties or to such party's employees, representatives, or agents, except to those employees, representatives, or agents of the receiving party who are required to have the information in order to perform this Agreement and except as may be required by law.

(ECF No. 325-1 ¶ 10.)

Mlazgar argues that this provision was breached because its confidential sales order information was wrongfully disclosed to Mlazgar's competitor JTH. (ECF No. 178 ¶ 133; ECF No. 342 at 7.) As evidence, Mlazgar points to Focal Point Vice President of Sales Peter Lena's deposition testimony that Focal Point forwarded Mlazgar's sales order forms to JTH without Mlazgar's permission. (ECF No. 325-5 at 143:14–19.) And the sales order forms contain sales information about distributor clients that was provided by Mlazgar to Focal Point. (*Id*. at 182:16–183:9; *see, e.g.*, ECF No. 343-93 (sealed) (example of a sales order form).) Mlazgar argues that the information in such sales order forms is thus confidential. (ECF No. 342 at 7; *see also* ECF No. 343-2 at 12–13.)

The Court agrees with Mlazgar that a reasonable jury could conclude that the sales order forms fall within the scope of the confidentiality provision of the Sales Representative Agreement as containing "financial data" disclosed by Mlazgar (a party to the Sales Representative Agreement) to Focal Point (the other party to the Sales

Representative Agreement). (ECF No. 325-1 ¶ 10.) A reasonable jury could further find that Focal Point breached the confidentiality provision of the Sales Representative Agreement based on Lena's testimony that Focal Point disclosed the sales order forms to JTH without Mlazgar's permission. And a reasonable jury could conclude that Mlazgar suffered damages because of that disclosure. (*See*, *e.g.*, ECF No. 332-28 at 25, 28 (Plaintiff's expert report on damages stating that "[t]he misappropriation of Mlazgar's confidential . . . information . . . w[as] instrumental in . . . allow[ing] JTH to unfairly compete with Mlazgar in eastern Wisconsin," and that "[Focal Point] benefited directly from . . . JTH Wisconsin's use of the misappropriated confidential . . . information"). Focal Point's motion for summary judgment on Count VI is denied. This claim will proceed to trial on both liability and damages.

### D. *Aiding and Abetting Breach of Fiduciary Duty Claim (Count VII)*

In Count VII, Mlazgar alleges that Defendants aided and abetted two distinct breaches of fiduciary duty by seven former Mlazgar employees: a breach of the fiduciary duty of loyalty and a breach of the fiduciary duty to maintain confidentiality. (ECF No. 178 ¶¶ 137, 139.) As to the duty of loyalty, Mlazgar argues that Defendants aided and abetted a breach by substantially assisting the seven employees in soliciting business for JTH while they were employed by Mlazgar. (ECF No. 342 at 38–40.) As to the duty of confidentiality, Mlazgar asserts that Defendants aided and abetted a breach by

substantially assisting the seven employees in misappropriating confidential information

from Mlazgar. (*Id*. at 35–38.)

Under Minnesota law, a claim for aiding and abetting tortious conduct requires

the plaintiff to establish that:

> (1) the primary tort-feasor . . . commit[s] a tort that causes an injury to the
> plaintiff; (2) the defendant . . . know[s] that the primary tort-feasor's conduct
> constitutes a breach of duty; and (3) the defendant . . . substantially assist[s]
> or encourage[s] the primary tort-feasor in the achievement of the breach.

*Witzman*, 601 N.W.2d at 187. "Aiding and abetting is not an independent tort"; rather, it

allows a party to "be held jointly and severally liable" for an underlying tort by the

primary tortfeasor. *Zayed v. Assoc. Bank, N.A.*, 913 F.3d 709, 714 (8th Cir. 2019) (citing

Minnesota caselaw).

Under Mlazgar's theory, the primary tortfeasors are the seven employees, and the

underlying torts are their breaches of their fiduciary duties of loyalty and confidentiality.

An employee can breach their duty of loyalty "by encouraging a third party to terminate

a contract between the employer and the third party [through solicitation]." *Cenveo Corp.*

*v. S. Graphic Sys., Inc.*, 784 F. Supp. 2d 1130, 1136 (D. Minn. 2011) (citing *Schmidt v. Blue*

*Lily Farms LLC*, No. A08-1398, 2009 WL 2151135, at *2 (Minn. Ct. App. July 21, 2009)). An

employee can also breach their duty of loyalty by breaching their duty of confidentiality

to their employer. *Polaris Indus., Inc. v. Mangum*, 690 F. Supp. 3d 966, 976 (D. Minn. 2023)

("[The] duty of confidentiality for an employee is derivative of the broader duty of loyalty

owed by employees to their employers." (citing *Hr'g Assocs., Inc. v. Downs*, No. A16-1317,

2017 WL 2414852, at *8–9 (Minn. Ct. App. June 5, 2017)). Even assuming a cause of action

for aiding and abetting a breach of fiduciary duty may exist here,[36] Mlazgar's claim here

fails under either theory.

---

[36] The cases cited by Mlazgar involve claims premised on a breach of a common law duty of loyalty of an employee to their employer. *See Cenveo Corp.*, 784 F. Supp. 2d at 1136; *Polaris Indus., Inc.*, 690 F. Supp. 3d at 976; *see also Rehab. Specialists, Inc. v. Koering*, 404 N.W.2d 301, 304 (Minn. Ct. App. 1987) ("An employee's duty of loyalty prohibits her from soliciting the employer's customers for herself, or from otherwise competing with her employer, while she is employed."). But Mlazgar's aiding and abetting claim is based on an underlying claim for breach of a *fiduciary* duty of loyalty by the seven employees. (ECF No. 178 ¶¶ 136–140.) Because Defendants do not argue otherwise, the Court assumes for sake of argument that the seven employees who left Mlazgar for JTH were Mlazgar's fiduciaries. But it is unclear to the Court that any of the seven employees owed fiduciary duties to Mlazgar. *See Fairview Health Servs. v. Armed Forces Off. of Royal Embassy of Saudi Arabia*, 705 F. Supp. 3d 898, 916 (D. Minn. 2023) ("A fiduciary relationship is characterized by a 'fiduciary' who enjoys a superior position in terms of knowledge and authority and in whom the other party places a high level of trust and confidence." (citing *Carlson v. SALA Architects, Inc.*, 732 N.W.2d 324, 330–331 (Minn. Ct. App. 2007))). The seven employees do not seem to fit into any of the categories of per-se fiduciary relationships recognized under Minnesota law. *See id.* ("Per se fiduciary relationships include trustee-beneficiary, attorney-client, business partnerships, director-corporation, officer-corporation, and husband-wife." (citing *Swenson v. Bender*, 764 N.W.2d 596, 601 (Minn. Ct. App. 2009))); (*see* ECF No. 343-16 at 1 (listing six of seven employees' positions); ECF No. 343-17 at 23:7–12 (noting Hendrickson's role as a specification sales representative).) So Mlazgar's claim would have to be based on the seven employees having been in a de facto fiduciary relationship with Mlazgar, which is characterized by "special circumstances." *Fairview Health Servs.*, 705 F. Supp. 3d at 916 (listing special circumstances recognized under Minnesota law). And "Minnesota courts are reluctant 'to sustain a cause of action for breach of a de facto fiduciary duty when the cause of action merely disguises another, more apposite but unavailing legal theory.'" *Id.* (citing *Swenson*, 764 N.W.2d at 603–04). The Court doubts that special circumstances apply to turn the relationship between the seven employees and Mlazgar into a fiduciary relationship. Nevertheless, because the Court disposes of this claim on other grounds, the Court need not make this determination here.

First, on Mlazgar's duty-of-confidentiality theory, there is no evidence in the record to find that Defendants knew of any misappropriation of confidential information by the seven employees. And without any such knowledge, Defendants could not have substantially assisted in procuring such a breach of the employees' duty of confidentiality. *See Witzman*, 601 N.W.2d at 186 ("[A]iding and abetting liability is based on proof of a scienter—the defendants must *know* that the conduct they are aiding and abetting is a tort." (emphasis in original, citing Restatement (2d) Torts § 876(b))).

Second, on Mlazgar's duty-of-loyalty theory, the only evidence supporting it is convoluted at best, and goes like this: Legrand Holding's Vice President Michals gave JTH's Kirkhoff the green light to have then-Mlazgar employee Hendrickson solicit Mlazgar client OCL to change its sales agent in the Territory to JTH.[37] (ECF No. 343-3 (sealed) at 150:24–151:25.) But Mlazgar is still OCL's sales agent in the Territory. (ECF No. 343-9 at 157:25–158:4.) So Mlazgar cannot establish that it suffered any harm caused by Legrand Holding's purported aiding and abetting of Hendrickson's breach of the duty of loyalty. *See Witzman*, 601 N.W.2d at 187 ("[T]he primary tort-feasor must commit a tort *that causes an injury* to the plaintiff." (emphasis added)).

---

[37] That Michals knew in "The Plan" correspondence with Kirkhoff that the seven employees were leaving Mlazgar for JTH and that JTH was planning to become the new sales agent for various Legrand Holdings' manufacturers in the Territory (ECF No. 343-16 at 1–2) does not provide a concrete basis for finding that Defendants substantially assisted the seven employees in breaching their fiduciary duty of loyalty.

Because the facts in the record do not support either of Mlazgar's theories of Defendants aiding and abetting breaches of fiduciary duties by the seven employees, Defendants are entitled to summary judgment on this claim.

### E.    Tortious Interference Claims (Counts IX and X)

In Counts IX and X, Mlazgar alleges that Defendants tortiously interfered with Mlazgar's existing contracts and prospective economic opportunities with other lighting manufacturers, including Legrand Holdings' other lighting products subsidiaries. (ECF No. 178 ¶¶ 149–159.) Mlazgar points to "The Plan" correspondence and to the later $250,000 in market development investment to JTH-Wisconsin. (*See* ECF No. 343-16 at 1; ECF No. 343-47.) In other words, Mlazgar claims that Defendants tortiously interfered with its contracts (and the prospective renewal of those contracts) with certain lighting manufacturers by providing its competitor JTH-Wisconsin with $250,000 in market development capital while knowing of JTH's intent to attempt to poach these manufacturers from Mlazgar.

Under Minnesota law, Mlazgar must prove five elements to establish tortious interference with a contract: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." *Sysdyne Corp. v. Rousslang*, 860 N.W.2d 347, 351 (Minn. 2015) (citation omitted). A different but related tort is tortious interference with prospective economic advantage, which requires a plaintiff to establish five elements:

1) The existence of a reasonable expectation of economic advantage;
2) Defendant's knowledge of that expectation of economic advantage;
3) That defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation;
4) That in the absence of the wrongful act of defendant, it is reasonably probable that plaintiff would have realized his economic advantage or benefit; and
5) That plaintiff sustained damages.

*Gieseke*, 844 N.W.2d at 219.

For both torts, Legrand Holdings has a qualified privilege to intervene in the contracts and prospective economic opportunities of its own wholly-owned subsidiaries.[38] *See Nordling v. N. States Power Co.*, 478 N.W.2d 498, 505–07 (Minn. 1991); *United States v. R.J. Zavoral & Sons, Inc.*, 894 F. Supp. 2d 1118, 1128 (D. Minn. 2012) ("[A] parent [company] is privileged to, or justified in, interfering with the contracts of its wholly-owned subsidiary provided it does not use wrongful means and acts to protect its economic interests." (citing *James M. King & Assocs., Inc. v. G. D. Van Wagenen Co.*, 717 F. Supp. 667, 679 (D. Minn. 1989)). The privilege is lost if the interference is improper, but if Legrand Holdings acts in the good-faith belief that its actions are in furtherance of the subsidiary's business, then there is no tortious conduct. *See Nordling*, 478 N.W.2d at 507.

---

[38] Relatedly, Focal Point cannot interfere with its own contracts. *Petroskey v. Lommen, Nelson, Cole & Stageberg, P.A.*, 847 F. Supp. 1437, 1449 (D. Minn. 1994), *aff'd*, 40 F.3d 278 (8th Cir. 1994). To the extent that Mlazgar alleges that Focal Point interfered with its own contracts, the claim fails.

Legrand Holding was privileged to intervene in the contracts between Mlazgar and its wholly-owned subsidiaries (including Kenall), because there was a good-faith business justification for doing so. Legrand Holding had an established relationship with JTH in other Midwest territories, and it saw an opportunity to build on that relationship in the Territory, given shifting dynamics in the lighting products sector and cross-territorial overlap among distributors, contractors, and specifiers in the region. (ECF No. 332-16 (sealed) at 9; ECF No. 332-22 (sealed) ¶ 30.) And no evidence shows that Legrand Holdings interfered with the contracts and prospective business opportunities of its wholly-owned subsidiaries with Mlazgar out of bad-faith or malice.

As for the rest of Mlazgar's tortious interference claims, there is no evidence in the record from which a reasonable jury could find that Defendants intentionally interfered with Mlazgar's contracts or prospective economic opportunities with any non-wholly-owned subsidiary of Legrand Holding. That Defendants were aware of JTH's intent to solicit business from existing clients of Mlazgar (who did, in fact, transfer their business to JTH[39]) does not mean that Defendants themselves engaged in any tortious conduct to

---

[39] Mlazgar lost contracts in Wisconsin with non-Legrand Holding subsidiaries listed in "The Plan" correspondence, including Bega, Kelvix, Hubbell (Conglomerate), Luminii, and Structura. (ECF No. 343-9 at 155:11–161:4; ECF No. 343-16 at 2.)

induce those non-Legrand brands to breach their contracts with Mlazgar.[40] Defendants are entitled to summary judgment on each of Mlazgar's tortious interference claims.

### F.    Conspiracy Claim (Count VIII)

Mlazgar's final outstanding claim is Count VIII, for civil conspiracy. "To prevail on a civil conspiracy claim, a plaintiff must establish that defendants agreed to accomplish an unlawful purpose, and took concerted actions to achieve that purpose." *Damon v. Groteboer*, 937 F. Supp. 2d 1048, 1078 (D. Minn. 2013) (citation and quotation marks omitted); *Harding v. Ohio Cas. Ins. of Hamilton, Ohio*, 41 N.W.2d 818, 824 (Minn. 1950). But a conspiracy claim fails if "it is not supported by an underlying tort." *See D.A.B. v. Brown*, 570 N.W.2d 168, 172 (Minn. Ct. App. 1997) ("[L]iability for conspiracy [i]s of necessity predicated upon underlying civil wrong." (citing *Harding*, 41 N.W.2d at 824)).

Defendants are entitled to summary judgment on each of Mlazgar's common law and statutory tort claims. The Court need not analyze Mlazgar's conspiracy claim any further, because it is not supported by any underlying tort. *See Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 926 (8th Cir. 2004) ("Because the [tort] claim is legally insufficient for

---

[40] It would be entirely speculative for a jury to conclude that the $250,000 market development payment provided by Legrand Holding to *JTH* was an inducement to *other manufacturers* to breach their contracts with Mlazgar and move to JTH.

want of proof . . . the civil conspiracy claim, which depends on a viable underlying tort, must fail as well." (citing *Harding*, 41 N.W.2d at 824, and *D.A.B.*, 570 N.W.2d at 172)).[41]

## IV.    Mlazgar's Motion for Summary Judgment on Counterclaims

That leaves the matter of Defendants' outstanding counterclaims. Defendants have requested to voluntarily dismiss counterclaim Counts I (breach of contract), III (false designation of origin, false description, and unfair competition), and V (consumer fraud and deceptive business practices). (ECF No. 339 at 2 n.1.) The Court dismisses these counterclaims with prejudice under Rule 41(a)(2) of the Federal Rules of Civil Procedure, leaving only counterclaims Counts II and IV for consideration on summary judgment.

### A.    Trademark Infringement Counterclaim (Counterclaim Count II)

Counterclaim Count II is for trademark infringement under Section 32 of the Lanham Act. This section of the Lanham Act imposes liability for the unauthorized use of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services [when] such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). After the Sales Representative Agreement was terminated, Mlazgar

---

[41] Because Defendants are entitled to summary judgment on each claim for which Legrand North America is named, the Court need not address Defendant's contention that Legrand North America is not a proper party to this lawsuit. (ECF No. 333 at 16.)

continued to list Focal Point and use its mark[42] on its line card and website.[43] (ECF No. 228 at 16–27 ("Am. Countercls.") ¶ 18; *see also* ECF No. 338-8 at 5–7.) Focal Point claims that this infringed its trademarks.[44] (Am. Countercls. ¶ 42.) Mlazgar only ceased listing Focal Point's mark on its website on September 16, 2022, after Focal Point filed its initial counterclaims. (*See* ECF No. 340-4 at 2; ECF No. 340-8 at 161:10–163:5.)

Defendants' counterclaim under Section 32 of the Lanham Act hinges on whether Mlazgar's post-termination use of the Focal Point mark on its website and line card created confusion in the market as to the affiliation between Mlazgar and Focal Point.[45] Such claims tend to fall within the ambit of Section 43(a)—and not Section 32—of the Lanham Act. *See* J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 23:8

---

[42] Focal Point has a registered trademark in its mark. (ECF No. 338-7 at 2.)

[43] Under the Sales Representative Agreement, Mlazgar had a limited licensed to use Focal Point's marks. (ECF No. 325-1 ¶ 9(a) ("[Focal Point] grants [Mlazgar] a non-exclusive, non-transferable license *during the term of this Agreement* to use the appropriate [Focal Point] trademarks in connection with the sale, promotion, and marketing of the Products within the Territory." (emphasis added).)

[44] Legrand Holding claims "[a]s the parent company of Focal Point, [it] has been equally damage[d] and harmed by [Mlazgar's] trademark infringement." (Am. Countercls. ¶ 46.)

[45] Mlazgar argues that it is entitled to summary judgment on Defendants' trademark claim because "[i]t is a 'fundamental principle' that 'trademark law does not prevent the sale of genuine goods bearing a true mark even if the sale if not authorized by the mark owner.'" (ECF No. 324 at 17 (citing *Minn. Mining & Mfg. Co. v. Rauh Rubber, Inc.*, 943 F. Supp. 1117, 1128 (D. Minn. 1996)).) But this "genuineness" case law does not apply. Defendants' counterclaim is about the likelihood of confusion as to an *affiliation* between Focal Point and Mlazgar arising from Mlazgar's use of Focal Point's mark in its advertising of its sales agent services on its line card.

(5th ed.) ("A federal claim under Lanham Act § 43(a) for infringement of an unregistered mark is triggered by a use which 'is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association' of the user with the senior user." (citing 15 U.S.C. § 1125(a)(1)(A))).

That said, the Court considers that such a claim may still be permissibly brought under Section 32 based on Mlazgar's use of Focal Point's mark "in commerce . . . in connection with the . . . advertising of any . . . services . . . [when] such use is likely to cause confusion." 15 U.S.C. § 1114(1)(a). Other courts have similarly allowed such claims to be brought under Section 32.

> As is plain from this statutory text [of 15 U.S.C. § 1114(1)(a)], the Act's protection against infringement is not limited to any particular type of consumer confusion, much less exclusively to confusion as to source. Rather, the Lanham Act protects against numerous types of confusion, including confusion regarding affiliation or sponsorship.

*See Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 161 (2d Cir. 2016); *see also Amoco Oil Co. v. Rainbow Snow*, 748 F.2d 556, 558 (10th Cir. 1984) (considering erroneous the district court's failure to consider "the context of confusion that results from a mistaken belief in common sponsorship or affiliation" in analyzing a claim brought under 15 U.S.C. § 1114(1)).

Defendants seek both damages and injunctive relief for their trademark infringement claim. To the extent that Defendants seek actual damages, Mlazgar is entitled to summary judgment because Focal Point and Legrand Holding have presented

no evidence that Mlazgar's use of the Focal Point mark on its line card on its website caused any actual confusion.[46] *See Minn. Pet-Breeders, Inc. v. Schell & Kampeter, Inc.*, 843 F. Supp. 506, 519 (D. Minn. 1993) (granting summary judgment for defendants with respect to actual damages on plaintiff's trademark infringement claim where there was "no evidence of the *fact* of damage").

But injunctive relief may be granted for a trademark infringement claim even without actual confusion, where a claimant demonstrates that there was a likelihood of confusion in the marketplace. At oral argument, Defendants insisted that its request for injunctive relief for counterclaim Count II was not rendered moot by Mlazgar's voluntary cessation of the practice of listing Focal Point's mark on the line card on its website, because Mlazgar only did so in response to Defendants filing their counterclaims. *See Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." (citation omitted)). In making this

---

[46] Defendants cite to two email threads to argue there was actual confusion in the market from Mlazgar's use of the mark on its line card. (ECF No. 339 at 22 (citing ECF Nos. 340-3 (sealed); 340-5 (sealed)).) But even if these email threads establish that confusion existed in the marketplace as to an affiliation between Mlazgar and Focal Point, they do not establish that such confusion was caused by Mlazgar's use of Focal Point's mark on the line card on its website. In fact, they do not even mention the mark's inclusion on the line card or website. When Focal Point's Rule 30(b)(6) corporate representative was asked at his deposition "[h]ow does Focal Point know that [Mlazgar's use of Focal Point's mark] caused confusion in the market," he conceded "[t]here's nothing that directly points to it." (ECF No. 325-6 at 156:2–5.)

argument at the hearing, Defendants pointed to Mlazgar's position that Mlazgar still represented Focal Point because there was no proper termination under the MTSRA. (*See* ECF No. 338-3 at 4.)

Accepting the underlying premise of Defendants' voluntary cessation argument, the Court still concludes that Defendants' request for injunctive relief is now moot. That is so because under Mlazgar's theory that the Sales Representative Agreement was never properly terminated or nonrenewed, such a renewal would last for only one year from the date on which the Sales Representative Agreement was originally set to expire, March 10, 2022. (ECF No. 325-1 ¶ 2.) And so, after March 10, 2023, Defendants' request for injunctive relief was rendered moot—not because of Mlazgar's prior voluntary cessation of the challenged practice—but because any legal claim that Mlazgar had to use the Focal Point mark on its line card expired on that date.

### B.    *IUDTPA Counterclaim (Counterclaim Count IV)*

Counterclaim Count IV is for violation of the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"). (Am. Countercls. ¶¶ 53–59.) Mlazgar argues that the IUDTPA does not apply to its conduct, because the relevant conduct in dispute did not "occur primarily and substantially in Illinois."[47] (ECF No. 324 at 24 (citing *BCBSM, Inc. v.*

---

[47] Mlazgar makes a separate argument that the IUDTPA requires a plaintiff to "allege that the defendant disparaged the quality of its goods or services." (ECF No. 324 at 24 (citing *Kole v. Vill. of Norridge*, 941 F. Supp. 2d 933, 963 (N.D. Ill. 2013)).) But that requirement only applies to a claim brought under the IUDTPA's disparagement subdivision, 815 Ill. Comp. Stat. 510/2(a)(8). *See Kole*, 941 F. Supp. 2d at 963 (analyzing plaintiff's

*Walgreen Co.*, 512 F. Supp. 3d 837, 856 (N.D. Ill. 2021)).) Defendants never responded to this argument. (ECF No. 339 at 23–25; *see also* ECF No. 355 at 16 (noting that Defendants "entirely ignored" this argument in their briefing).)

Illinois courts consider the IUDTPA to not have an extraterritorial effect, and so the statute only applies if the disputed conduct occurs primarily and substantially in Illinois. *BCBSM, Inc.*, 512 F. Supp. 3d at 856 (collecting cases). In evaluating whether conduct "occur[s] primarily and substantially in Illinois," courts balance nine factors:

> (1) the claimant's residence; (2) the defendant's place of business; (3) the location of the relevant item that is the subject of the disputed transaction; (4) the location of the claimant's contacts with the defendant; (5) where the contracts at issue were executed; (6) the contract's choice of law provisions, if there are any; (7) where the allegedly deceptive statements were made; (8) where payments for services were to be sent; and (9) where complaints about the goods or services were to be directed.

*Id.* at 856–57 (citation omitted).

Applying these factors, only the second, sixth, eighth, and ninth factors favor applying Illinois law—Illinois is Focal Point's domicile, the Sales Representative Agreement contained an Illinois choice-of-law clause, and payments and complaints about Focal Point's goods and services were to be directed to Focal Point in Illinois. By contrast, the first and third factors point to the dispute occurring in Minnesota as that is Mlazgar's domicile and where Mlazgar's website and emails were published. Similarly,

---

"disparagement claim under the [IUDTPA]"). Defendants' claims are not brought under the disparagement subdivision of the IUDTPA, but are instead consistent with its likelihood-of-confusion subdivisions. *See* 815 Ill. Comp. Stat. 510/2(a)(2), (3), and (12).

the fourth and seventh factors point to the dispute occurring in Wisconsin and Michigan as those states are where the Territory is located and are the locations from which electrical distributors received the allegedly deceptive statements. The fifth factor is uncertain as it is unclear on the face of the Sales Representative Agreement where it was executed.

In that context, the Court is unconvinced that an Illinois court would consider the dispute to have occurred "primarily and substantially" in Illinois. Thus, summary judgment is granted to Mlazgar on Defendants' counterclaim Count IV.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.   Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART, consistent with this Order:

     a.   DENIED as to Counts I and VI of Mlazgar's claims;

     b.   GRANTED as to Counts III, IV, VII, VIII, IX, and X of Mlazgar's claims;

2.   Mlazgar's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART, consistent with this Order:

     a.   GRANTED as to liability for Count I of Mlazgar's claims;

     b.   DENIED as to damages for Count I of Mlazgar's claims;

      c.     DENIED AS MOOT as to Counts I, III, and V of Defendants' Counterclaims, which the Court DISMISSES WITH PREJUDICE;

      d.     GRANTED as to Defendants' request for damages relief for Count II of Defendants' Counterclaims;

      e.     DENIED AS MOOT as to Defendants' request for injunctive relief for Count II of Defendants' Counterclaims; and

      f.     GRANTED as to Count IV of Defendants' Counterclaims.

3.     Remaining for trial are:

      a.     The issue of damages arising from Focal Point's violation of the MTSRA in Count I of Mlazgar's claims; and

      b.     The issues of liability and damages on Mlazgar's claim in Count VI against Focal Point for breach of the confidentiality provision of the Sales Representative Agreement.

Dated: August 11, 2025               BY THE COURT:

                                        s/Nancy E. Brasel
                                        Nancy E. Brasel
                                        United States District Judge